Brian J. ROEDL, a Minor, by Frederick W. ROEDL and Mary Roedl, His Natural Parents and Friends, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–1995 V.

United States Court of Federal Claims.

July 26, 1993.

Suzanne Sturgeon, Bloomington, IN, for petitioners.

James M. Moore, U.S. Dept. of Justice, Washington, DC, for respondent.

## OPINION

WIESE, Judge.

On March 12, 1993, the special master issued a decision in this case dismissing, for failure of proof, petitioners' claim to compensation under the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa–1 to 300aa–34 (West 1991 & Supp.1993), for the neurological and physical impairments of their now-adult son, Brian J. Roedl. Petitioners alleged that these impairments (lack of muscular coordination, epilepsy, and mental retardation) are traceable to the administration of a measles-mumps-rubella (MMR) vaccine that Brian received on July 9, 1974, at the age of 12½ months. Specifically, the special master rejected the argument that Brian's afflictions are the result of a vaccine-caused aggravation of a preexisting seizure disorder or the sequela of a vaccine-caused encephalopathy. Brian's condition, ruled the special master, "is the natural and predictable progression of his underlying disorder." *Roedl v. Secretary of the Dep't of Health and Human Servs.*, No. 90–1995 V, slip op. at 16, 1993 WL 89221 (Fed.Cl.Sp.Mstr. Mar. 12, 1993).

The case is now before this court on petitioners' motion for review. We are asked to set aside the special master's decision on the ground that the evidence, properly considered, fully supports petitioners' alternative assertions of a vaccine-caused injury: that Brian experienced a significant aggravation of an existing seizure disorder within 15 days of receipt of the MMR vaccine or, alternatively, suffered an encephalopathy from the vaccine within that same time frame. Respondent opposes the motion and asks that we affirm. Oral argument was heard on July 8, 1993.

The court's conclusion, announced from the Bench at the closing of the argument and more fully explained in this opinion, is that the special master's decision is entitled to finality.

## I

As is often the case in suits for compensation arising under the Vaccine Act, the dispute between the parties does not involve a disagreement about the existence of facts but, rather, a disagreement about the medical significance of facts. Such is the nature of the problem we encounter here.

Both sides agree that Brian Roedl showed signs of a seizure disorder months before receiving the MMR vaccine on July 9, 1974. This disorder was exhibited, first of all, through an ever-increasing frequency of head-dropping episodes accompanied by a backward rolling of the eyes—there were as many as fifteen such episodes of "minor motor" seizure per day by the time of the vaccine's administration—and, secondly, by the results of an electroencephalogram (EEG) which revealed a grossly abnormal brain-wave pattern. It is also acknowledged that, by the age of 27 months, Brian exhibited a mixed seizure disorder (meaning he regularly experienced both minor motor seizures and grand mal seizures), suffered from lack of muscular coordination, and was recognized to be mentally retarded. (In medical science this combination of symptoms is referred to as Lennox–Gastaut Syndrome).[1] The question presented by the case is whether Brian's present condition reflects the natural progression of his underlying neurological disorder (respondent's position) or is, instead, the sequela of a vaccine-caused injury (petitioners' position).

The facts from which the parties draw their competing assessments are few. In the evening of the same day on which he had received his MMR vaccination, Brian suffered his first major tonic/clonic (grand mal) seizure lasting approximately 15 minutes. Doctors attributed the event to a

---

1. As explained by Dr. Rita Lee, a pediatric neurologist who testified for respondent, Lennox–Gastaut Syndrome is not a diagnosis but a "description of signs and symptoms that are so commonly found together that they have been given a name."

fever although, as noted by the special master, "the fever was not high—less than 102 degrees Fahrenheit." He remained in the hospital for two days, was treated with phenobarbital and, upon release, was "pretty much back to normal" (his mother's words).

Four days later, during the night of July 13–14, Brian experienced his second and third grand mal seizures. But, unlike the first grand mal attack, these seizures were accompanied by high fever and cold-like symptoms. Brian was diagnosed as suffering from a virus, probably pharyngitis or possibly otitis media. He was hospitalized for four days. His condition during this hospital stay, as reported by his parents, is described by the special master in these words:

> His mother testified that "during this hospitalization, he didn't look like the same child" and he was not as alert or perceptive, ... especially during the first few days. ... He slept a lot, cried more than usual, was not as active as usual, and, in short, acted sick. His father testified that Brian had a vacant look, that he was not responsive and did not show any emotion upon seeing his father. He showed no interest in playing with the things he had showed interest in prior to the MMR shot.... He would not concentrate on an object with inquisitive interest as he did before. [Slip op. at 3 (citations omitted) ].

Following the second hospitalization, Brian was often sick. As the special master's decision goes on to note, "he had a lot of ear infections and had [grand mal] seizures whenever he had a fever but also at times when there was no fever." Slip op. at 3. He experienced such a seizure on July 22, 1974, another on July 23, 1974 and yet a third on July 24, 1974. On July 24, 1974, the 15th day after the MMR vaccination, he developed a rash which his mother thought looked like measles. However, because of the unavailability of the family doctor, no diagnosis was made of this rash, that is, it was never determined whether this was a

post-vaccinal measles rash (a not uncommon occurrence, according to the testimony) or a rash caused by Brian's anti-convulsant medication. (According to the testimony, the two rashes are indistinguishable).

In the months that followed these July events, medical records reflect that Brian's neuro-muscular development continued, though at a slower rate than before. He began to walk independently at 13½ months but, by January of 1975, he had developed a wide gait and strabismus (lack of paired eye focus). In August of 1975, slightly more than one year after the MMR vaccination, the University of Michigan Seizure Clinic determined that Brian was mentally retarded.

## II

There are, as we have indicated, competing views of the causes of the events that befell Brian Roedl following the administration of the MMR vaccine and of their significance in explaining his present-day condition.

Petitioners offer a two-fold theory of vaccine-caused injury. First, regarding the grand mal seizure that Brian suffered on the evening of his vaccination day, petitioners contend that this event marked the onset of a permanent change for the worse in his pre-existing neurological disorder. Specifically, they contend that the grand mal seizure signified a transition of his impairment to a mixed seizure disorder and thus also a transition to an altered neurological status—one that carried with it a recognized increase in the likelihood of mental retardation.

Given this claimed increase in risk of mental retardation and, in addition, the timing of the seizure (it occurred within 15 days of receipt of the MMR vaccine), petitioners maintain that they have satisfied the statutory requisites for a presumed vaccine-caused "significant aggravation" of a pre-existing disorder.[2]

---

**2.** Under the Vaccine Act, a presumption of vaccine causation is accorded to certain injuries

(so-called "table" injuries) whose signs or symptoms appear within specified time periods fol-

During the course of the hearing before the special master, petitioners endeavored to bolster the statutory presumption of vaccine-causation by claiming (through the testimony of Dr. Tom Hrisomalos, a specialist in infectious diseases), that the grand mal seizure was triggered by a hypersensitivity reaction to the MMR vaccine. Specifically, Dr. Hrisomalos's position was that Brian suffered a hypersensitivity reaction that produced a fever which led, in turn, to the febrile seizure.

In addition to the argument claiming a significant, vaccine-caused, aggravation of a pre-existing seizure disorder, petitioners also contend that the grand mal seizures associated with Brian's second hospitalization were the outward manifestations of an encephalopathy—an insult to the brain, that ultimately produced the neurological injuries that now afflict him. The argument, in other words, is that Brian's impairments may be clinically identified as the signs and symptoms of a brain disturbance independent of his pre-existing seizure disorder.

Petitioners attribute the claimed encephalopathy to an infection and fever resulting from the attenuated measles virus vaccine. As signs of this infection, they point to the cold-like symptoms that Brian exhibited (fever and middle-ear inflammation), the lethargy that beset him, and the rash that he subsequently developed. And since this asserted injury, like the claim of significant aggravation, involves a neurological manifestation that appeared within 15 days of Brian's receipt of the MMR vaccine, petitioners assert that, in accordance with the statutory injury table, vaccine causation is to be presumed.

Turning to the case on the other side, respondent offered expert testimony that unequivocally rejected each of petitioners' vaccine-based causation theories. Responding, first of all, to the contention linking Brian's initial grand mal seizure to the MMR vaccine, respondent's first expert, Dr. Richard Rapkin, a specialist in pediatric infectious diseases,[3] explained that because of the time necessary for an infectious disease process to establish itself, the seizure could not have been caused by a measles infection. "[I]t's just not possible for that seizure to have been due to the measles—I'm not saying it's unlikely. I'm saying, it's not possible for the measles vaccine to have induced that seizure by infection."

The witness was equally emphatic in his rejection of a hypersensitivity reaction as the explanation for Brian's first grand mal seizure. Dr. Rapkin explained that the only hypersensitivity reactions identified with the MMR vaccine were those associated with egg ingestion (the vaccine is produced in a chick embryo cell culture). And such reactions, he noted, are usually anaphylactic, i.e., immediate in nature. "Anaphylaxis," the expert went on to say, "is big time, major, bee sting like reaction, where you get hives and you have shock, and you have laryngeal edema." Because Brian did not suffer such a response, reliance on a hypersensitivity reaction to explain Brian's first grand mal seizure was described by Dr. Rapkin as an explanation that "strains ... credulity."

Going on to the other part of petitioners' argument, the expert acknowledged that the grand mal seizures that necessitated Brian's second period of hospitalization could have been related to the MMR vaccine. "It is certainly possible that his illness that began on the 14th was related to measles vaccine, and that if that was the case, and his illness itself exacerbated his seizure disorder by precipitating more seizures because of fever, then it might have been related in that sense." However, Dr. Rapkin rejected the idea that this illness

lowing vaccination. 42 U.S.C.A. § 300aa–14. In the case of the MMR vaccine, vaccine causation is presumed if, within 15 days following vaccination, the recipient experiences inter alia, anaphylaxis, encephalopathy, residual seizure disorder or the significant aggravation of any of these conditions.

3. Dr. Richard Rapkin, is currently the medical director of Children's Hospital of New Jersey, and professor of pediatrics and assistant dean for Children's Hospital of New Jersey Medical School. Dr. Rapkin is board certified in pediatrics.

(Brian's second hospitalization) was accompanied by, or caused by, an encephalopathy. The reason for this conclusion was the absence of other neurological signs of the sort generally associated with an encephalopathy. That is, in addition to the fever, lethargy and seizures which Brian exhibited during his hospital stay, the witness would also have expected to see "increased intercranial pressure, vomiting, pabel edema [papilledema ?], persistent lethargy, not intermittent lethargy and improvement ... [and] [s]eizures that alternated, perhaps becoming focal." Further, the witness stated, "I would have expected him to look to his physicians ill enough to warrant further evaluation," including "a spinal tap" to rule out encephalopathic symptoms attributable to bacterial meningitis.

To sum up, it was Dr. Rapkin's view that Brian Roedl was afflicted with an idiopathic seizure disorder (i.e., a seizure disorder of unknown origin) that was not at all affected by the MMR vaccine. Upon cross-examination, the witness further explained that, although pediatric neurology was not his specialty, nevertheless, in his experience, minor motor seizures, when seen at an early age (as in Brian's case), almost invariably led to grand mal seizures. Minor motor seizures, it was also revealed, are far more frequently associated with subsequent neurologic damage than are grand mal seizures.

Respondent's second expert, Dr. Rita Lee, a pediatric neurologist, confirmed the correctness of Dr. Rapkin's observations. Minor motor seizures, she pointed out, are minor in name only. Such seizures, even when initially not appearing in conjunction with grand mal seizures, identify a child that faces a "much increased risk for development of a variety of seizures, ... a larger repertoire of seizures as you get older, and [a child] at significant risk for mental retardation."

Although unable to quantify these risks, the witness did say that when the mixed seizure disorder is present from the start, and is accompanied with the sort of EEG which Brian displayed, then a progression to mental retardation is "very, very likely." However, even in the case of a child that exhibits at the outset only one form of seizure, the prognosis for developing a mixed seizure disorder and mental retardation, though now not "as likely," still remains "high."

When questioned further on the latter point, the witness answered:

I honestly don't remember ever treating a child who had only simple head drops and it never progressed to have any other type of seizure. I know that is not something that you would find if you read all of the epilepsy literature, but in my own personal experience, that is prognostically a very bad thing [i.e., minor motor seizures affecting a child under one year of age and occurring in association with the type of EEG presented here].

Based on her medical knowledge and experience regarding the likelihood of progression from a single seizure disorder to a mixed seizure disorder,[4] and given too the absence of any other credible explanation for the occurrence of Brian's first grand mal seizure, Dr. Lee was of the view that that first seizure was not occasioned by the MMR vaccine.

Proceeding to petitioners' alternative contention—that Brian's present impairments are the aftermath of an encephalopathy experienced during his second hospitalization—Dr. Lee's views on this issue parallel those expressed by Dr. Rapkin. Her position was that the degree of neurological injury manifested in Brian's present-day condition is incompatible, from a causation standpoint, with those signs of a purported encephalopathy upon which petitioners base their claim. In Dr. Lee's view, the disproportion between these signs of injury and the impairments they are said to explain, rules out the possibility of medical

---

**4.** For a period of roughly twelve years, Dr. Lee was responsible for providing all of the pediatric neurology care for a county hospital district in Texas. In that capacity, she treated literally hundreds of infants who, like Brian, presented minor motor seizures prior to their first birthday.

cause and effect. Here is how the witness put her thoughts:

I say that on the basis that the less apparent a child's abnormality is immediately after an acute encephalitis, so that you wouldn't recognize it immediately, then the less severe the deficit is in the long run going to be. If you don't recognize that child as severely damaged immediately after a significant encephalitis, what you're probably going to see is, for example, a child who's one and a half years old, who, at school age, is hyperactive and has some learning disabilities. [But], [t]here is no way that you're going to see a child [like Brian] who has had a severe enough encephalopathy or encephalitis to make them ataxic, epileptic, spastic, mentally retarded, etc., walk out of that hospital looking normal or close to normal [as Brian did at the time]. That's just not a possibility.

In summary, it was Dr. Lee's position that Brian was afflicted with an idiopathic seizure disorder whose progression was ongoing and ultimately would come to express itself in the triad of symptoms referred to as Lennox–Gastaut Syndrome. "I think that he followed a very typical course, even though we don't know the etiology of it. I think that course began before he had the MMR, and I think we have little, if any, evidence of encephalitis."

### III

█ In her disposition of this case, the special master first took up the question whether Brian had suffered an encephalopathy during or in conjunction with his second (and subsequent) grand mal seizures (*i.e.,* the occasion of his second period of hospitalization). Her conclusion was that he had not. Petitioners now challenge this determination saying, in effect, that the decision was arbitrary because it (i) placed undue emphasis on the absence, in Brian's hospital records, of any of the more

immediate or usual signs of encephalopathic injury, and (ii) ignored the correlation between encephalopathy and Brian's present impairments.

█ The argument is not well taken. The special master's decision reflects a careful and comprehensive assessment of the competing views presented by the various experts; the position ultimately adopted by the special master is squarely in line with the views expressed by respondent's experts. Since those views were offered by medical doctors with many years of specialized experience and represent views that are in full accord with accepted medical doctrine, the special master's reliance upon them can hardly be called arbitrary. A reasoned choice between competing points of view, where each is credible in its own right, must be accorded finality. Such a decision is, by definition, rational.

█ Moving on to petitioners' claim of significant aggravation, we begin, as did the special master, with the statutory definition of that term. The Vaccine Act defines "significant aggravation" as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C.A. § 300aa–33(4). To come within the terms of this definition, a vaccine claimant must provide evidence of a post-vaccinal disturbance that medical science recognizes as the marker of an increase in severity of an underlying neurological disorder, *i.e.,* a change for the worse in the claimant's then-existing condition.[5]

Was there such evidence here? Although the special master's resolution of this issue is not clear, we think the evidence of a significant aggravation is unmistakably in petitioners' favor. All would agree that the change in character of the

---

5. It is a separate question whether the disturbance also signals a departure from the expected progression of the claimant's underlying disorder and an alteration in the ultimate prognosis. That question is one respondent will be required to address as part of any claim of alternate causation. The initial inquiry, however, focuses on the immediate change in the claimant's condition—the contrast between pre- and post-vaccinal symptoms—and the accompanying state of health.

seizures which beset Brian after the receipt of the MMR vaccine signaled a neurological shift for the worse in his underlying seizure disorder, both in terms of an immediate increase in disability and in terms of an increased likelihood of mental deterioration. Brian had moved further along the road of neurological impairment. While the record does not quantify the difference in risk profiles between Brian's pre- and post-vaccinal conditions, few would dispute that an increase in the likelihood of mental retardation must be viewed as the mark of a significant aggravation. To suggest otherwise is to suggest a degree of tolerance for vaccine-caused injuries that would be contrary to the very purpose of the Vaccine Act.

Given then the conclusion that Brian suffered a significant aggravation of his pre-existing disorder within 15 days of the vaccine's administration, the question we come to—the question to which so much of the testimony was directed—is whether factors unrelated to the vaccine, rather than the vaccine itself, provide the most probable explanation for the state of his present disability.

The special master began her examination of this issue by noting that though, "[a]t first blush, it would appear that petitioners' claim [of significant aggravation] has merit," (because of the overt and frightening character of a grand mal seizure and its occurrence in this case within hours of the vaccination), nevertheless she decided "[t]he claim . . . is defeated here, because the first grand mal seizure occurred prior to the alleged vaccine-induced encephalopathy or encephalitis, i.e., the putative mechanism whereby further damage to the central nervous system occurred." Slip op. at 11.

The court cannot endorse the correctness of the quoted text for two reasons. First, on a factual level, the text reflects a misapprehension of petitioners' position. Contrary to the understanding implicit in the special master's statement, the petitioners never based their claim to compensation solely upon a contention of encephalopathy. Rather, their argument was (and still is) that, in addition to an encephalopathy, Brian also experienced a significant aggravation of his underlying disorder, the first clinical sign of which was the grand mal seizure that occurred the evening of the vaccination.

■ Second, and no less important, the quoted text is wrong on an analytical level. Given that the evidence demands a finding of significant aggravation, it would follow that the first grand mal seizure, being part of the clinical signs of that aggravation, must be presumed to have been vaccine-caused. Accordingly, it was error for the special master, in the subsequent weighing of the parties' competing theories of causation, to have attributed the occurrence of the first grand mal seizure to the progression of Brian's underlying disorder rather than to the vaccine.

But, does the error make a difference? Unfortunately, the answer is no. Even assuming, as we do, that Brian's first grand mal seizure was a vaccine-triggered event, the evidence remains heavily weighted in favor of identifying a non-vaccine factor as the agency responsible for the deterioration in health that Brian suffered after receipt of the MMR vaccine. That agency, of course, was Brian's pre-existing neurological disorder. Among the evidentiary considerations that support this conclusion are the following:

—Brian's neurological signs, prior to receipt of the vaccine, placed him in a clinical category identified with a high risk of mental retardation. While it is impossible to say with certainty that Brian's disorder would have progressed to mental retardation, the likelihood of that outcome, when examined in terms of the experience of respondent's expert, approaches 100 percent.

—Brian's pre-existing seizure disorder, prior to receipt of the vaccine, was not static, but progressing (i.e., his health was eroding even before the vaccine intervention).

—Brian's neurological status, following receipt of the MMR vaccine, did not demonstrate any deterioration not otherwise to be

anticipated on the basis of the clinical signs he exhibited prior to receipt of the vaccine. In other words, there was no departure in the expectable stages of his mental and physical decline.

Based on these factors, the court concludes that it is the progression of Brian's underlying neurological disorder, rather than a vaccine-caused injury, that identifies the most probable cause for the neurological impairments that characterized his condition after the age of 12½ months.

■ There is one last matter to consider. Petitioners point out that, under the terms of the Vaccine Act, respondent is foreclosed from relying on an idiopathic disorder to overcome the statutory presumption of vaccine causation. The section referred to, section 13(a)(2)(A), declares that proof of causation due to a factor unrelated to the vaccine may not include "any idiopathic, unexplained, unknown, hypothetical, or undocumentable cause, factor, injury, illness, or condition." Therefore, the argument continues, since Brian's pre-existing seizure disorder is of an unknown origin, it may not be accepted as the explanation for his present condition.

In further support of this contention, petitioners point to the decision in *Koston v. Secretary of the Dep't of Health and Human Servs.*, 974 F.2d 157 (Fed.Cir.1992), a case in which the appellate court declined to overturn a trial court ruling denying respondent's motion to withdraw a concession of vaccine-causation in favor of a diagnosis of injury due to Rett Syndrome. The basis for the appellate court's affirmance was that Rett Syndrome was an idiopathic disorder and, as such, could not be offered in evidence of respondent's claim of alternate causation. In other words, because the statute rendered the intended proof valueless, the exclusion of that proof was not considered error.

Petitioners overread the evidentiary constraints imposed by section 13 of the Vaccine Act and the *Koston* decision. Neither authority should be understood as saying that, in demonstrating alternate causation, respondent may not rely upon commonly recognized clinical signs of neurological injury, *independent* of those presumed to be vaccine related, simply because those signs are without a known cause. A prohibition so sweeping would come close to making the presumption of vaccine causation irrebuttable because, as the record in this case tells us, most seizures that occur in infancy have no known cause.

■ Correctly read, both the statute and the *Koston* decision should be taken to mean that, in proving alternate causation, respondent may not rely upon an idiopathic disorder whose *only* clinical signs are those upon which the inference of vaccine causation is also founded. In other words, respondent cannot overcome the inference of vaccine causation simply by giving the same set of clinical data a different label. Rather, where proof of alternate causation rests upon an idiopathic disorder, the evidence of that disorder must be based on signs and symptoms other than those upon which the inference of vaccine causation depends. The proof in this case—the clearly defined pre- and post-vaccinal evidence of a neurological disorder unrelated to the vaccine—satisfies this standard.

IV

For the reasons stated in this opinion, the decision of the special master is affirmed.

