Julie CHEN, By Her Parents and Next Friends, Li–Fu CHEN, and Vineta Chen, Petitioners,

v.

SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.

No. 90–2570 V.

United States Court of Federal Claims.

Aug. 16, 1993.

Eve L. Hill, Pierson Semes & Finley, Washington, DC, for plaintiff Chen.

Catherine Reeves Oster, Washington, DC, for HHS.

## ORDER

## AFFIRMING SPECIAL MASTER'S DECISION

WIESE, Judge.

This case is before the court on petitioners' appeal from a decision of the special master, entered April 19, 1993, denying their claim to compensation under the National Childhood Vaccine Injury Act, 42 U.S.C.A. §§ 300aa–1–300aa–34 (West 1991 & Supp.1993), for an alleged "table" injury, *i.e.,* an injury whose occurrence the Vaccine Act presumes was vaccine-caused.[1] The claim rests on the contention that, within three days after the administration of a diphtheria-pertussis-tetanus (DPT) vaccine, petitioners' daughter suffered an encephalopathy—an insult to the brain—that resulted in a significant aggravation of her pre-existing neurological disorder—an encephalopathic condition, characterized by psychomotor degeneration, known as Rett syndrome.[2]

The special master denied relief on the ground that petitioners had failed to establish the claimed encephalopathy and thus, also, the claimed aggravation. "The weight of evidence," said the special master, "is that the petitioners have confused Julie's dramatic transition from stage I to stage II of Rett syndrome, which was not encephalitic, with an encephalitic process." *Chen v. Secretary of the Dep't of Health and Human Servs.,* No. 90–2570 V, slip op. at 6, 1993 WL 141543 (Fed.Cl.Sp.Mstr. Apr. 19, 1993).

Petitioners challenge this conclusion. They say, in substance, that the special master misread the evidence, much of which they see as standing indisputably in their favor. They contend that this erroneous threshold finding condemns all the rest of the special master's analysis and thus no part of the decision, either of fact or law, may be accorded finality. Respondent answers by saying that the decision is correct in all respects and should therefore be affirmed.

Oral argument was heard on August 13, 1993. At the conclusion of the argument the court indicated that the decision of the special master was correct in its findings of fact—they are supported by substantial evidence—and correct also in its legal conclusion—that petitioners failed to establish any basis for recovery under the terms of the Vaccine Act. The court also indicated, however, that while the special master's decision warranted affirmance, it also warranted further explanation. It is with this last concern in mind that this Order is written.

## I

Petitioners' daughter, Julie Chen, received her fourth DPT vaccination on July

---

**1.** Under the Vaccine Act, a presumption of vaccine causation is accorded to certain injuries (so-called "table" injuries) whose signs or symptoms appear within specified time periods following vaccination. 42 U.S.C.A. § 300aa–14. In the case of the DPT vaccine, vaccine causation is presumed if, within 3 days following vaccination, the recipient experiences *inter alia,* anaphylaxis, encephalopathy, residual seizure disorder or the significant aggravation of any of these conditions.

**2.** The disorder known as Rett syndrome is an encephalopathy within the meaning of the Vaccine Act; hence, a significant aggravation of Rett syndrome would qualify as a table injury.

30, 1981, at the age of 18 months. Shortly after the administration of the vaccine, Julie became febrile (the fever lasted for three days) and irritable. On the second day following receipt of the vaccine, she began crying in a manner her father described as "very loud and very stressful." This crying continued for approximately two weeks. At the end of the crying period, Julie was withdrawn and unresponsive and remained so for two to four months. Her reemergence from this distant state was gradual. However, a subsequent medical evaluation, performed at the age of 22 months, revealed that Julie had undergone a severe regression in language and motor development. After this experience, Julie's deterioration continued and she has since gone on to demonstrate all of the diagnostic criteria associated with Rett syndrome.[3]

It is upon the circumstances described above that petitioners base their claim. They maintain that these events demonstrate that Julie experienced an encephalopathy immediately following receipt of the vaccine and that this encephalopathy, in turn, hastened the onset of the second stage of her disorder (a stage characterized by the rapid and specific regression of acquired abilities) and/or magnified the extent and degree of her present impairment. Thus, petitioners' claim is essentially twofold: they allege both an encephalopathy and a significant aggravation of a pre-existing encephalopathic condition. Each condition is recognized as a table injury when the first manifestation or onset of the injury occurs (in the case of the DPT vaccine) within three days of the vaccine's administration.

## II

In his disposition of the claim, the special master issued two rulings. In the first, a bench ruling rendered at the conclusion of the evidentiary proceedings, the special master declared that the evidence, when examined in its entirety, was insufficient to show either that Julie experienced an encephalopathy "in the August time period of 1981 ... or that her condition is worse today than it would reasonably be expected to have been but for the administration of the DPT vaccine...." (Transcript of proceedings of March 5, 1993, at 147). Julie's symptoms, the special master further noted, "are classical symptoms of the syndrome experienced by 90% or more of the victims." *Id.*

■ In his second decision, the ruling published on April 19, 1993, the special master explained that, "while the bench ruling stands on its own," the nature of the case warranted further discussion since such discussion might prove useful in the resolution of subsequent claims involving Rett syndrome. This decision then goes on to describe the characteristics of Rett syndrome and concludes by saying that the event which petitioners saw as an encephal-

---

3. Rett syndrome is a progressive neurological disorder, genetic in origin, that has been diagnosed only in girls. The disorder progresses through four distinct stages which have been described as follows:

*Stage I.* The early-onset stagnation period is present between 6 months to 1½ years of age. The clinical profile is nonspecific and additional abilities are often acquired, albeit delayed.

*Stage II.* This stage usually appears at 1–2 years of age and is characterized by rapid and specific regression of acquired abilities, as well as personality change. In many patients, this stage is well-demarcated with rapidly appearing disturbances in contact and communication and loss of acquired, purposeful hand use/skill and speech. A miserable, screaming mood is common. This stage may appear in a few patients as "encephalitic" or "toxic." In contrast, it sometimes can be so protracted and silent that it is difficult retrospectively to delineate in time.

*Stage III.* This stage begins when the RS girl, clearly mentally deficient, appears to regain some of her original personality and when the autistic features begin to resolve. Her mood stabilizes and she sometimes makes some developmental progress. This process usually occurs at 3–4 years of age, but can be delayed, and persists many years or even decades....

*Stage IV.* This stage has been defined as the stage when neuromuscular weakness, wasting, and other abnormal neurologic signs have finally forced previously mobile RS girls into a wheelchair-dependent life. This stage often occurs during school age or early adolescence....

Hagberg, *Rett Syndrome: Clinical Peculiarities, Diagnostic Approach, and Possible Cause*, 5 Ped.Neuro. 75, 76–77 (1989), filed as part of Ex. 46.

opathy was more likely the onset of the second stage of Rett syndrome—an event that unfolds in dramatic fashion, akin to an encephalitic intrusion, in approximately 16 percent of Rett syndrome victims.

The difficulty the court has with the special master's decision is not with what was said—none of that can be faulted—but with what was not said. While the decision holds that there was neither an encephalopathy nor any significant aggravation of a pre-existing encephalopathy, it fails to explain these results and thereby invites misunderstanding. The present appeal is in large measure grounded in such a misunderstanding. Therefore, for the sake of a more complete explanation, we add here the analytical underpinnings that support the special master's decision.

First, with respect to the claim of encephalopathy, petitioners are correct in saying that persistent inconsolable crying is a clinical sign of an encephalopathy. However, as both the Vaccine Act and the testimony in this case make clear, such evidence, standing alone, is not enough to support a diagnosis of encephalopathy. ("Signs and symptoms such as high pitched and unusual screaming, persistent unconsolable crying ... are compatible with an encephalopathy, but in and of themselves are not conclusive evidence of encephalopathy." 42 U.S.C.A. § 300aa–14(b)(3)(A)).

Nor is it of aid to petitioners' case that an electroencephalogram, performed six months after the DPT administration, revealed an encephalopathy. The presumption of vaccine causation that is written into the Vaccine Act is founded on the temporal relationship that exists between the administration of a vaccine and the signs of injury. It is the closeness in time between these events that supports the inference of cause and effect. Therefore, in order to establish a DPT–related table injury, the evidence of that injury must be drawn from clinical signs and symptoms that emerge within three days of the vaccine's administration. 42 U.S.C.A. § 300aa–14(a). Evidence of encephalopathy drawn from a diagnostic procedure performed six months after the alleged caus-

ative event is of little probative value in supporting an inference of a prior vaccine-caused injury. That is especially so where that evidence is more readily explained as a contemporaneous sign of the expected progression of the claimant's underlying neurological disorder. Based on these considerations, no error may be attributed to the special master's conclusion that petitioners had not proven an encephalopathy.

Going on to petitioners' claim of significant aggravation, the Vaccine Act defines that term as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C.A. § 300aa–33(4). In a recent decision of this court, *Roedl v. Secretary of the Dep't of Health and Human Servs.*, 28 Fed.Cl. 740 (1993), we stated that, in order "[t]o come within the terms of this definition, a vaccine claimant must provide evidence of a post-vaccinal disturbance that medical science recognizes as the marker of an increase in severity of an underlying neurological disorder, *i.e.*, a change for the worse in the claimant's then-existing condition." *Id.* at 745. In further explaining this point, the opinion noted that it is a change for the worse in the health of the individual *at the time of the vaccine's administration*, rather than a change in future expected health, that constitutes the proof of a *prima facie* case of vaccine-causation. *Id.* at 745 n. 5.

■ Once a vaccine petitioner has made out a *prima facie* case, the burden of going forward with the evidence shifts to respondent. To overcome the presumption of vaccine-causation and to prevail in the final outcome, respondent must demonstrate by a preponderance of the evidence either that the post-vaccinal disturbance was not vaccine-caused or, if so caused, that it was nevertheless no more than a minor event in the claimant's health history—one that did not alter the expected progression of the claimant's neurological disorder or the ultimate gravity of that disorder.

Despite a careful reading of the special master's decision, the court remains uncer-

tain about the analytical steps that led to the rejection of petitioners' claim of significant aggravation.[4] The ultimate decision is clear enough: the weight of the evidence showed it to be more likely than not that the course of Julie's disease was unaltered by the vaccine encounter. What the court cannot tell, however, is whether the evidence balanced out as it did because petitioners failed to make a *prima facie* case or because respondent's proof was enough to overcome a presumption of vaccine-caused injury.[5] This is more than just an academic concern. If the court and its practitioners are to deal with these cases in a fair and efficient way, it is imperative that the analysis of a significant aggravation claim be set out in an analytically disciplined fashion. A step-by-step analysis is called for. Thus, every such case must begin with a reasoned answer to the question whether the petitioner has made out a *prima facie* case as herein defined. If the answer to the question is yes, *i.e.*, if the vaccine claimant is accorded the benefit of a presumption of vaccine causation, then the burden of going forward with evidence to rebut or meet the presumption shifts to the respondent. (However, the burden of persuasion on the existence of the presumed fact remains on the vaccine claimant throughout the proceedings). Essentially what respondent must show is that the particular characteristics of the claimant's underlying disorder, when evaluated in light of the broader medical profile associated with that disorder, make it more likely than not that the vaccine did not contribute to the claimant's on-going neurological deterioration in any clinically remarkable way. Thus, if after taking all the evidence into account, the special master arrives at the conclusion that the vaccine probably was not a substantial factor contributing to the claimant's present condition, then recovery for a vaccine-caused aggravation must be denied.[6]

■ In this case, we need not reach the question of alternate causation in order to affirm the special master. The evidence shows clearly enough that a *prima facie* case does not exist. Simply put, there were no changes in severity of Julie's underlying disorder within the three-day period following the administration of the DPT vaccine. Thus, a presumption of vaccine-caused injury never arose; the evidence was insufficient from the start.

### III

For the reasons stated, the decision of the special master denying petitioners' claim to compensation under the Vaccine Act is affirmed.

---

4. In relating what it sees as the analytical framework underlying the special master's decision, respondent offers the explanation that it is the four-step approach set out in *Misasi v. Secretary of the Dep't of Health and Human Servs.*, 23 Cl.Ct. 322 (1991), that served as a guide. The statement reflects a misunderstanding of *Misasi*. *Misasi*'s four-step approach is simply an enumeration of the elements of proof that must be in place at the conclusion of trial in order to evaluate a claim of significant aggravation. The case says nothing at all about how the burden of demonstrating these elements is to be allocated between the parties during trial.

5. That petitioners failed in their efforts to prove an encephalopathy does not also mean that they failed to prove a significant aggravation. Signs of injury less severe than a table encephalopathy may satisfy the statute's definition of significant aggravation.

6. In tort law, a legal cause of harm is identified as any negligent conduct that is a "substantial factor" in bringing about that harm. Restatement (Second) of Torts § 9 comment b, § 431(a) (1965).