Roger P. and Heidi **MISASI**, Legal Representatives of Maggie Jo Misasi, Petitioners,

v.

**SECRETARY OF THE DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

No. 90–400V.

United States Claims Court.

June 7, 1991.

Andrew W. Hutton, Wichita, Kan., for petitioners.

Sherri L. Thornton, with whom were Asst. Atty. Gen. Stuart M. Gerson, Helene M. Goldberg, Director, and John Lodge Euler, Deputy Director, Washington, D.C., for respondent.

## OPINION

ANDEWELT, Judge.

This is a child vaccine action brought pursuant to the National Childhood Vaccine Injury Act of 1986, as amended, 42 U.S.C. §§ 300aa–1 *et seq.* (West Supp.1991) (the Act). The Act establishes a program for payment of compensation for injuries or death caused by the administration of vaccines. Petitioners, Roger P. and Heidi Mi-

sasi, allege that their daughter, Maggie Jo Misasi, born on October 4, 1988, suffered injuries compensable under the Act as a result of a DPT (diphtheria, pertussis, and tetanus) vaccine inoculation administered on November 29, 1988, when she was less than two months old.

The petition initially was assigned to Special Master E. LaVon French pursuant to 42 U.S.C. § 300aa–12(d). During telephonic hearings on January 29, and January 31, 1991, the special master heard testimony from three medical experts, petitioners(1), Maggie's baby-sitter, and a rehabilitation consultant. All of the medical experts agreed that Maggie was born with a congenital condition they described as "oculo-cerebral dysgenesis" (OCD), a congenital malformation of the brain and eyes. At birth, Maggie had an abnormal appearance, including a misshapen and small head. She also had dislocated hips, hypotonia (lack of muscle tone), and a wide-spaced nipple. The medical experts, however, were of divided opinion as to whether the DPT inoculation "significantly aggravated" Maggie's pre-existing OCD condition.

In a March 4, 1991, decision, the special master denied the petition stating:

(1) "it is more likely than not that Maggie's congenital anomalies are the most significant causative factors in her present condition, and ... there is insufficient evidence that her functional status would have been materially different if no DPT vaccine had been administered";

(2) "[i]f there was an aggravation of her condition ... the court is not persuaded that it was significant"; and

(3) assuming that Maggie's condition was significantly aggravated by the vaccine, "it would be impossible to quantify that portion of her handicap that was due to the vaccine and which was the result of her birth defects."

*Misasi v. Secretary, HHS,* No. 90–400V, slip op. at 7–8, 1991 WL 36325 (Cl.Ct. Mar. 4, 1991).

Pursuant to 42 U.S.C. § 300aa–12(e)(1), petitioners filed a timely motion seeking review in this court of the special master's

decision. For the reasons set forth below, the court concludes that the special master fairly and conscientiously considered all of the evidence and her decision is affirmed.

## I.

The requirements for a petition seeking compensation under the Act are set forth in 42 U.S.C. § 300aa–11(c):

> A petition for compensation under the Program for a vaccine related injury ... shall contain—
>
> (1) ... an affidavit, and supporting documentation, demonstrating that the person who suffered such injury ...
>
> (A) received a vaccine set forth in the Vaccine Injury Table ...
>
> \*　\*　\*　\*　\*　\*
>
> (C)(i) sustained, or had significantly aggravated, any illness, disability, injury, or condition set forth in the Vaccine Injury Table ...
>
> (C)(ii)(I) sustained, or had significantly aggravated, any illness, disability, injury, or condition not set forth in the Vaccine Injury Table but which was caused by [the] vaccine....

The prerequisites for securing compensation based on such a petition are described in 42 U.S.C. § 300aa–13 (Section 13), in pertinent part, as follows:

> (a) General rule.
>
> (1) Compensation shall be awarded under the Program to a petitioner if the special master or court finds on the record as a whole—
>
> (A) that the petitioner has demonstrated by a preponderance of the evidence the matters required in the petition by section 300aa–11(c)(1) of this title, and

(B) that there is not a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition is due to factors unrelated to the administration of the vaccine described in the petition.

One of the injuries in the Vaccine Injury Table for the DPT vaccine is encephalopathy, 42 U.S.C. § 300aa–14(a)(I)(B), which is defined in the Act, in pertinent part, as "any significant acquired abnormality of, or injury to, or impairment of function of the brain." 42 U.S.C. § 300aa–14(b)(3)(A). Petitioners' argument, as clarified at oral argument before this court, is that OCD falls within the statutory definition of encephalopathy and compensation is warranted here because Maggie suffered a significant aggravation of her OCD condition after administration of the DPT vaccine.

■ To evaluate whether an individual suffered a significant aggravation of a particular condition, it is necessary to (1) assess the individual's condition prior to administration of the vaccine, *i.e.*, evaluate the nature and extent of the individual's pre-existing condition, (2) assess the individual's current condition after the administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine not been administered.[1] A petitioner satisfies Section 13(a)(1)(A) if he or she establishes by a preponderance of the evidence that the individual's current condition constitutes a significant aggravation of the individual's predicted condition had the vaccine not been administered.[2] The Act defines "significant aggravation" as "any change for the worse in a preexisting condition which results in markedly greater disability, pain,

---

**1.** Citing the following statement from *First Commercial Bank v. Secretary, HHS,* 90–537V, slip op. at 4, 1991 WL 33243 (Cl.Ct. Feb. 25, 1991), the special master applied essentially the same standard:

> [A] determination that a change in condition constituted a significant aggravation must be based on a thorough review and analysis of the injured person's condition before and after the vaccination in question, including consideration of what changes could reasonably

have been expected in the course of the condition in the absence of any aggravation. *Misasi,* slip op. at 5.

**2.** To be entitled to secure compensation, the petitioner must also meet the requirements of Section 13(a)(1)(B) in that there is not a preponderance of the evidence that the individual's current condition (*i.e.,* the aggravation of a preexisting condition) "is due to factors unrelated to the administration of the vaccine."

or illness accompanied by substantial deterioration of health." 42 U.S.C. § 300aa–33(4).

## II.

Herein, there apparently was no significant disagreement among the medical experts as to Maggie's current condition. Maggie is mentally retarded, is subject to seizures, has delayed motor skills, and has impaired vision. The experts disagree, however, as to the proper characterization of Maggie's pre-vaccine condition and her predicted condition had she not received the vaccine.

With respect to Maggie's pre-vaccine condition, the experts disagree as to the severity of her OCD condition. None of the medical experts had examined Maggie prior to the administration of the DPT vaccine and each expert based his opinion, at least in part, on his own interpretation of the notes of the doctors who had examined Maggie prior to the vaccination. Dr. Gerald Tremblay, one of petitioners' experts, expressed the opinion that prior to administration of the DPT vaccine, Maggie had a "relatively benign" form of OCD. On the other hand, respondent's expert, Dr. Robert Baumann, concluded that Maggie exhibited many of the neurological signs associated with a "severe" OCD condition.

As to Maggie's predicted condition had she not received the DPT vaccine, Dr. Tremblay testified that Maggie would have been one of the higher functioning OCD children. He explained that Maggie would have been "mildly retarded, and possibly have some mild visual impairment, and mild problems with [muscle] tone." Dr. Baumann, by contrast, testified that considering the nature of Maggie's birth anomalies, he could not imagine a better outcome than "severely retarded." In a letter summarizing his opinion, Dr. Baumann concluded: "[T]his child has a developmental anomaly. Her outcome is the outcome expected for that anomaly."

After reviewing the evidence before her, the special master found Dr. Baumann's testimony most convincing and dismissed the petition. The special master explained:

Petitioners have simply not met their burden in this case. The court finds Dr. Baumann's explanations and opinions to be the more reasonable and persuasive. The court concludes that it is more likely than not that Maggie's congenital anomalies are the most significant causative factors in her present condition, and that there is insufficient evidence that her functional status would have been materially different if no DPT vaccine had been administered.

*Misasi*, slip op. at 7–8.

## III.

■ The Act provides that the special master's decision should not be set aside unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the [decision-maker]." *Motor Vehicle Mfg. Ass'n of the United States, Inc. v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The touchstone of the arbitrary and capricious standard is rationality. *Hyundai Electronics Indus. Co. v. ITC*, 899 F.2d 1204, 1209 (Fed.Cir.1990). If the decisionmaker has considered the relevant factors and has not made a clear error of judgment, its decision must be affirmed. *Id.*

■ Petitioners contend that the special master's decision is arbitrary and capricious and an abuse of discretion because it relies upon allegedly flawed testimony by Dr. Baumann. As noted above, Dr. Baumann had not examined Maggie prior to the administration of the DPT vaccine and therefore based his opinions on the available medical records. Petitioners contend, in effect, that Dr. Baumann's interpretation of those records, in the context of all of the other testimony, is so clearly incorrect as to render the special master's reliance on that testimony reversible error.

Petitioners' experts testified, and Dr. Baumann agreed, that OCD is a static condition that should not result in the loss of achieved developmental milestones. Peti-

tioners argue that the medical records indicate that Maggie lost such a milestone after the DPT inoculation. Most significantly, they contend that she lost the visual ability to fix and track.

Dr. Baumann interpreted the medical records as indicating that Maggie could not fix and track prior to the DPT inoculation. The pertinent medical record of Maggie's examination by a pediatrician on the date of her vaccination notes: "dev[elopment]— looks 180°/coos some but doesn't smile. No rolling yet (in harness [approximately] 20 hrs/d[ay]." The attending pediatrician who wrote this note did not testify. As an expert, Dr. Baumann interpreted the note as indicating that the baby did not yet fix and track. Dr. Baumann explained:

I think those notes specifically omit fixes and follows because I do not think this child fixed or followed. What looks 180 degrees traditionally means is that she has full range of extraocular movement, that her eyes move 180 degrees. But it exclusively does not say that she fixes or follows. And it explicitly says she does not smile. A normal baby this age should fix, should follows [sic], and smile, and they usually all go together.

Dr. Baumann reasoned that since the notations in the medical record meant that Maggie could not fix and track, the absence of a specific reference to fixing and tracking was not significant because it was not necessary to "write it twice."

Petitioners' medical experts disagreed with Dr. Baumann's interpretation of the attending pediatrician's notes. Their opinions were supported by testimony from petitioners and their baby-sitter to the effect that Maggie fixed and tracked prior to the DPT inoculation.

The special master did not make a specific finding as to which testimony she believed on the issue of fixing and tracking. Her general endorsement of Dr. Baumann's testimony suggests that she may have agreed with his testimony. On the other hand, the special master apparently concluded that at least at some point in time, and for some reason, Maggie's ability to fix and track was impaired in that the

special master stated that Maggie had begun to "*recover*" that ability. The special master stated:

During November 1989, Maggie suffered status epilepticus and subsequently lost some motor skills and was much "floppier" than usual.

Since that time, Maggie has begun to *recover* some visual function such as fixing and tracking. She is described as an alert child, happy, and aware of her environment.

*Misasi*, slip op. at 3 (emphasis added).

But the absence of a specific finding on fixing and tracking is not fatal. First, it would not be arbitrary, capricious, or an abuse of discretion if the special master did adopt Dr. Baumann's view. Dr. Baumann's interpretation of the medical records, as an expert, is plausible. So, too, is his rejection of the testimony of petitioners and their baby-sitter that Maggie had fixed and tracked prior to the DPT inoculation. Dr. Baumann testified that when a baby is very young, people frequently mistake the baby's head movements in response to sound for the baby fixing and tracking.

Second, the special master's decision would not be internally inconsistent if she did conclude that fixing and tracking had been lost after the DPT inoculation. The special master made the additional finding that "Maggie has begun to recover" her ability to fix and track. This latter finding, which is not disputed, would support the special master's ultimate conclusion that petitioners had not established any "significant aggravation" of a pre-existing condition, *i.e.*, that petitioners did not satisfy their burden of establishing by a preponderance of the evidence a "markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C. § 300aa–33(4).

On this second point, Dr. Baumann did not base his conclusions as to the severity of Maggie's birth abnormality exclusively on his conclusion as to fixing and tracking. He noted the breached delivery, the shape of Maggie's head, and her visual inabilities, and he gave significant weight to her hypo-

tonic state. On this last point, the special master summarized Dr. Baumann's testimony as follows:

> Dr. Baumann places considerable weight on the negative implications of Maggie's continuing hypotonia (lack of muscle tone). Dr. Baumann referred to an article by Karen Nelson in Ken Swayman's two volume pediatric neurology textbook which indicates that in the early months of life, neurological evaluation of the infant depends upon the assessment of tone and on the infantile developmental reflexes. Dr. Baumann stated "this child's tone was abnormal, persistently abnormal. I think it was an important indicator that the child's brain was abnormal to, unfortunately, a severe degree."

> Dr. Baumann also discounted the inference that hypotonia in this case may have been due to caesarean delivery. In his opinion, the infant's hip abduction at birth was the result of hypotonia:

>> "[T]he reason that she dislocated and the reason they had to put her in her harness was because she was so severely hypotonic that her muscles in her hips and buttocks weren't tight enough to keep her hips in place. So that is a result of the hypotonia, not an independent disorder."

*Misasi,* slip op. at 6 n. 9 (citations omitted). With respect to Maggie's slow development after the DPT inoculation, Dr. Baumann testified that developmental problems often do not emerge until the infant progresses in age. As to Maggie's visual problems, the special master summarized Dr. Baumann's testimony as follows:

> Dr. Baumann does not believe Maggie's impaired vision is a consequence of the DPT but of her birth defect. Dr. Baumann stated that he knows of no scientific literature that shows any association between retinal problems and pertussis vaccine and that to his knowledge, such relationship has never been brought up or recognized.... In this regard, the

court notes that Dr. Tremblay's own diagnosis on February 17, 1989, includes the statement that "abnormality of retinal response is characteristic of children with dysgenesis [malformation] of the retina."

*Misasi,* slip op. at 7.

### IV.

One conclusion that is apparent from a study of the medical testimony is that even in the absence of a DPT inoculation, it is very difficult to predict the ultimate physical and mental status of a hypotonic OCD child less than two months old. Petitioners' own medical experts made significant concessions in this regard. Dr. Tremblay testified that "at two months, predicting the future of these children can still be difficult." Although Dr. Tremblay testified that he believes Maggie's mental handicap, hypotonia, developmental delay, and seizures are primarily due to the DPT inoculation, he admitted that OCD places an individual at risk for those very same conditions.[3] Furthermore, Dr. Tremblay stated that "in all honesty" he really could not say whether Maggie's OCD condition or her vaccine reaction was the main cause of her seizure disorder. Petitioners' other expert, Dr. Richard Gilmartin, admitted that while he believes that the DPT injury was an important factor responsible for Maggie's current condition, "the relative significance of the condition present at birth and the DPT injury are impossible to quantify."

In resolving the dispute before her, the special master had to evaluate the testimony of all of the experts and lay witnesses. She had an opportunity to question the medical experts and assess their credibility. Ultimately, she chose to rely primarily upon Dr. Baumann's testimony. That testimony is clear and coherent. Moreover, Dr. Baumann has impressive credentials. He is with the Department of Neurology, University of Kentucky, Child Neurology Group, and is board certified in pediatrics,

---

3. The special master noted that when petitioners' expert, Dr. Tremblay, first examined Maggie in February 1989, his diagnosis included the statement that "abnormality of retinal response

is characteristic of children with dysgenesis [malformation] of the retina." *Misasi,* slip op. at 7.

psychiatry, and neurology, with special competency in child neurology. Based on all of the evidence in the record, this court concludes that it was not arbitrary, capricious, or an abuse of discretion for the special master to rely upon Dr. Baumann's testimony to support her conclusions.

### Conclusion

For the reasons set forth above, the special master's March 4, 1991, decision was not arbitrary, capricious, an abuse of discretion, or contrary to law. That decision is sustained and the Clerk of the Court shall enter judgment accordingly.

IT IS SO ORDERED.