**Robert COSTA and Patricia Costa, Parents and Conservators of Stephen Costa, Petitioners,**

v.

**SECRETARY OF the DEPARTMENT OF HEALTH AND HUMAN SERVICES, Respondent.**

**No. 90–1476V.**

United States Claims Court.

Aug. 7, 1992.

Jack Gage, Cheyenne, Wyo., for petitioners.

Richard A. Schollmann, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for respondent.

## OPINION

MOODY R. TIDWELL, III, Judge:

This action comes before the court on the Special Master's certification of this case for interlocutory appeal. For the reasons set forth below, the court vacates the decision of the Special Master and remands the case for proceedings not inconsistent with this opinion.

### FACTS

Stephen Costa was born on February 21, 1969. Although Stephen was born with tuberous sclerosis ("TS"), a neurocutaneous disorder affecting the skin and nervous system, the disorder had not clinically manifested itself and Stephen appeared to be a normal child. He received his first Diphtheria–Pertussis–Tetanus ("DPT") vaccination on August 21, 1969, at the age of six months. Within twenty-four hours of the vaccination, Stephen began to have seizures which increased in frequency and severity. Stephen is severely mentally retarded and has a behavior disorder. He was diagnosed with tuberous sclerosis on October 23, 1975.

According to Dr. M. Gomez, a leading expert on the disorder, TS is defined as "a complex, genetically determined, variably expressed multisystem disorder of germ-cell organization and proliferation resulting in hamartomatous growth, and occasionally neoplasms, in one or more organs." [1] *Costa v. Secretary of HHS*, No. 90–1476V, slip op. at 5, 1992 WL 47334 (Cl.Ct. spec. mstr. Feb. 26, 1992) (quoting M. Gomez, *Tuberous Sclerosis* 63 (2d ed. 1988)). TS causes

---

**1.** Hamartomatous pertains to a disturbance in growth of a tissue in which the cells of a circumscribed area outstrip those of the surrounding areas. Neoplasm is any new and abnormal growth; specifically a new growth of tissue in which the growth is uncontrolled and progressive.

fleshy growths, or lesions, to appear on some organs, including the brain. The two types of brain lesions caused by TS are: (1) nodules that grow in the center of the brain around the ventricles, which may grow sufficiently to block circulation of the spinal fluid (tumors); and (2) lesions that do not grow and are located on the surface of the brain or cerebral cortex and which are responsible for seizures (tubers). An individual with tubers may function normally and not experience seizures. However, if a child is diagnosed as having more than five lesions on the brain, he will most likely suffer from seizures. The most common symptom of tuberous sclerosis is seizures. "Although ... TS seizures may occur at any age, they most often begin during the first months of a patient's life." *Id.* (quoting Gomez, at 21). Another clinical feature of patients with TS is mental retardation. Since a significant correlation exists between TS-induced seizures and retardation, the medical community knows of no patient with TS and mental retardation who has not had seizures. Moreover, "the age of seizure onset and the presence and severity of the mental subnormality are directly related. Almost all patients whose seizures began in the first two years of life were mentally defective...." *Id.* (quoting Gomez, at 29). Therefore, the common medical policy is to avoid DPT immunization in all patients with infantile spasms and other seizures, as well as those known to have TS, because "immunizations with DPT have been reported to precede the onset of infantile spasms," and repetitive seizures influence the outcome of the disorder. *Id.* (quoting Gomez, at 611).

## DISCUSSION

■ This court may set aside a Special Master's findings of fact or conclusions of law if they are found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 300aa–12(e)(2)(B) (Supp. II 1990). *See, Carlson v. Secretary of HHS,* 23 Cl. Ct. 788, 790 (1991) (*citing Loe v. Secretary of HHS,* 22 Cl.Ct. 430, 432 (1991)). The scope of review for this standard is exceedingly narrow; a court "may not substitute its own judgment for that of the Special Master if the Special Master has considered all relevant factors, and has made no clear error of judgment." *Loe,* 22 Cl.Ct. at 432; *see also, Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Hyundai Electronics Indus. Co. v. United States Int'l Trade Com.,* 899 F.2d 1204, 1209 (Fed.Cir.1990). Contrary to petitioner's assertions, the standard of review employed by the Claims Court in its appeal capacity under the National Childhood Vaccine Injury Act ("the Act") is not *de novo.* The Act explicitly limits this court to the narrow "arbitrary and capricious" standard for both facts and law, and it is under this standard that the court will review the instant case.

Due to the large number of cases involving the same tuberous sclerosis disorder before the Office of Special Masters, Special Master Millman noted in her decision that the outcome of this case on appeal was necessary to adjudicate the remaining TS cases. Consequently, Special Master Millman certified this case for interlocutory appeal, and sought to suspend further litigation in the pending TS cases to await the judgment of this court. The Special Master's reliance on 28 U.S.C. § 1292(b) (1988) was misplaced, however, because that section of the Code, which speaks to interlocutory appeal, encompasses interlocutory appeal by United States District Courts to the United States Courts of Appeal, and not by Special Masters to the Claims Court.[2]

---

**2.** 28 U.S.C. § 1292(b) (1988) states:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* [t]hat application

Moreover, the case at bar does not involve an interlocutory order or decree of the Special Master; here, the decision of the Special Master was final, and not intermediate. Therefore, interlocutory appeal is inappropriate in this case.

While the issue of whether this court may hear an interlocutory appeal from a Special Master must await another day, the court shall nevertheless review the decision of Special Master Millman pursuant to RUSCC Appendix J, paragraphs 22–35. Given the unusual posture of this case, the court, in its discretion, waives the strict time requirements in RUSCC Appendix J, Title VI, and considers the motion for review and petitioners' response in the context of the usual review of decisions of Special Masters under the National Vaccine Injury Compensation Program. 42 U.S.C. § 300aa–12(e) (1988 & Supp. II 1990).

The Vaccine Act provides two principal avenues for a petitioner to seek compensation for injuries arising from the administration of a DPT vaccine. First, if manifestation or significant aggravation of an injury set forth on the Vaccine Injury Table ("Table"), 42 U.S.C. § 300aa–14 (Supp. II 1990), occurs within the time period designated on the Table, then causation is presumed. 42 U.S.C. § 300aa–11(c)(1)(C)(i) (1988 & Supp. II 1990). In such case, the Act requires petitioner to demonstrate only that specific symptoms were suffered within a particular time period. This is commonly referred to as an "on-Table" injury. Respondent then has the burden of proving by "a preponderance of the evidence that the illness, disability, injury, condition, or death described in the petition [was] due to factors unrelated to the administration of the vaccine." 42 U.S.C. § 300aa–13(a)(1)(B) (1988 & Supp. II 1990). The second avenue available to petitioner is more arduous. If manifestation or significant aggravation of an injury not listed on the Table occurs, or if a Table injury manifested itself outside the time period prescribed in the Table, then causation is not presumed and peti-

tioner must prove that the vaccine actually caused the injury by a preponderance of the evidence. 42 U.S.C. § 300aa–11(c)(1)(C)(ii) (1988 & Supp. II 1990); 42 U.S.C. § 300aa–13(a)(1)(A) (1988 & Supp. II 1990). Significant aggravation is defined as "any change for the worse in a pre-existing condition which results in markedly greater disability, pain, or illness accompanied by substantial deterioration of health." 42 U.S.C. § 300aa–33(4) (1988).

■ In her decision, Special Master Millman held that petitioners were entitled to compensation for an on-Table case of residual seizure disorder, and that Stephen's current condition was a sequela of his on-Table residual seizure disorder. Special Master Millman first found that Stephen did not have a condition pre-existing the DPT vaccination, since he was asymptomatic prior to the vaccination, and that Stephen's TS was not an on-Table illness because it did not fit within the definition of encephalopathy.[3] The Special Master reasoned that TS could not be an encephalopathy in this case "because it is not an acquired abnormality (since [sic] a TS child is born with it), nor is it an injury (being the result of inheritance or a genetic mutation) or an impairment (if there are no central nervous system symptoms, the brain is not impaired)." *Costa v. Secretary of HHS*, No. 90–1476V, slip op. at 26, n. 13, 1992 WL 47334 (Cl.Ct. spec. mstr. Feb. 26, 1992). Although petitioners did not allege entitlement under a theory of significant aggravation, the Special Master *sua sponte* discussed this theory at length and applied petitioners' facts to the four-part test enumerated by the court in *Misasi v. Secretary of HHS*, 23 Cl.Ct. 322, 324 (1991). In her analysis under the *Misasi* test, Special Master Millman concluded that petitioners in this case would fail prongs three and four, and therefore could not recover on a significant aggravation theory. Instead, the Special Master found that petitioners clearly met the criteria of a residual seizure

for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order (emphasis in original).

3. Encephalopathy is defined, in 42 U.S.C. § 300aa–14(b)(3)(A) (1988), as "any significant acquired abnormality of, or injury to, or impairment of function of the brain."

disorder within the time period listed on the Table.[4]

■ The court finds that the Special Master committed reversible error in finding that TS was not a pre-existing condition.[5] Although Stephen exhibited no outward clinical symptoms of the disorder, he was born with TS and was inflicted with the disorder, though latent, at the time of the vaccination. Stephen's TS existed prior to the vaccination, and the Special Master erred in finding otherwise.[6] The Special Master's erroneous factual finding caused the remainder of her decision to be infected with error.

As a consequence of her erroneous factual premise, the Special Master erred further in concluding that petitioners were not required to prove significant aggravation.[7] By failing to find that TS was a pre-existing condition, the Special Master failed to give proper deference to the intent of Congress in enacting the Vaccine Act's significant aggravation provisions. According to legislative history:

> The [Committee on Energy and Commerce] has included significant aggravation in the Table in order not to exclude serious cases of illness because of possible minor events in the person's past medical history. This provision does not include compensation for conditions which might legitimately be described as pre-existing (e.g., a child with monthly seizures who, after vaccination, has seizures every three and a half weeks), but is meant to encompass serious deterioration (e.g. a child with monthly seizures who, after vaccination, has seizures on a

daily basis). The Committee also intends that the time periods set forth in the Table apply to the significant aggravation in order for causation to be deemed to exist (e.g., a significant deterioration of a seizure disorder after DPT vaccination must first become manifest within three days of the vaccination).

H.R.Rep. No. 908, 99th Cong., 2d Sess. 15, 16, *reprinted in* 1986 U.S.Code Cong. & Admin.News 6287, 6344, 6356–57.

Although the committee report noted that "minor events" in a petitioner's medical history should not prevent compensation under the Act, TS is clearly not a "minor event." Nevertheless, the committee report also noted that if "serious deterioration" in a petitioner's health occurred after vaccination, the petitioner should receive compensation. The effect of a pertussis vaccine on the TS child in this case clearly caused, for the purposes of the National Childhood Vaccine Injury Act, the "serious deterioration" contemplated by the framers of the Act. Indeed, the examples provided in the committee report demonstrate that a child who suffers one seizure per month prior to vaccination is well ensconced within the protective boundaries of the Act. The court need not tarry to conclude that a seemingly normal child who has never seized, but who suffers a latent pre-existing condition that is awakened by the vaccine also falls well within the intent of Congress to compensate under the Act.

As noted above, the court in *Misasi v. Secretary of HHS*, 23 Cl.Ct. 322, 324 (1991), set out a four-part test to determine whether a petitioner is entitled to compen-

---

4. A residual seizure disorder occurs when a petitioner either suffers his first seizure unaccompanied by fever, or suffers his first seizure accompanied by a fever of less than 102 degrees, within three days after the administration of the vaccine, and then suffers two or more seizures within one year after the administration. 42 U.S.C. § 300aa–14(b)(2)(B) (1988).

5. The word pre-existing is defined as existing prior to something or someone else. *Random House College Dictionary* 1045 (1982).

6. The word latent is defined as present or potential, but not visible. *Random House College Dictionary* 757 (1982).

7. In prior TS cases, other Special Masters failed to acknowledge TS as a pre-existing condition. *Wilson v. Secretary of HHS*, No. 89–65V, 1991 WL 20064 (Cl.Ct. spec. mstr. Jan. 22, 1991), *affirmed on other grounds*, 23 Cl.Ct. 169 (1991); *Huber v. Secretary of HHS*, No. 89–72V, 1990 WL 293881 (Cl.Ct. spec. mstr. Aug. 6, 1990), *affirmed on other grounds*, 22 Cl.Ct. 255 (1991). Although those cases are not on appeal before this court, the court finds their analysis to be erroneous for the same reasons set forth here.

sation under a theory of significant aggravation. Under *Misasi*, the court is to:

(1) assess the individual's condition prior to administration of the vaccine, *i.e.*, evaluate the nature and extent of the individual's pre-existing condition, (2) assess the individual's current condition after the administration of the vaccine, (3) predict the individual's condition had the vaccine not been administered, and (4) compare the individual's current condition with the predicted condition had the vaccine not been administered.

*Id.*

In this case, prior to the vaccination, Stephen's TS was a latent disorder, since it was present but had as yet not manifested any visible symptoms. After the administration of the vaccine, Stephen began to seize within twenty-four hours, and developed massive infantile spasms which ultimately resulted in mental retardation, the condition in which he remains today. According to Dr. Gomez's testimony, a TS child's prognosis for normal intelligence becomes substantially more favorable the longer the child develops without seizing. However, it is clear that a child, such as Stephen, who has more than five tubers on his brain, will suffer seizures at some time in his childhood and eventually retard over time. If Stephen had not received the vaccination when he did, each day without a TS-induced seizure would have delayed, though not avoided, the onset of retardation. Although Stephen was predisposed to have seizures and mental retardation because he had more than five tubers on his brain, the vaccine activated the clinical manifestations of the latent condition, thereby significantly aggravating the condition. His TS symptoms, had he *not* received the vaccine, would have appeared gradually as he developed. Here, within twenty-four hours after the vaccine was administered, Stephen was seizing uncontrollably and became severely retarded far sooner and more severely than had he not had the DPT vaccine. By triggering Stephen's latent condition, the vaccination unleashed seizures and mental retardation. Given the proximity of time between the administration of the vaccination and the onset of the seizure, the vaccine, and not the TS, is more likely to be the etiology of the seizures.

Here, Stephen's pre-existing condition can be characterized either as an on-Table seizure disorder, or contrary to the Special Master's finding, as an on-Table encephalopathy. Stephen's TS is a seizure disorder, albeit a latent one, because seizures are the most common symptom of the disorder. In addition, Stephen falls within the definition of an on-Table seizure disorder because he suffered his first seizure within three days after the administration of the vaccine. 42 U.S.C. § 300aa-14(b)(2)(B) (1988). Moreover, according to respondent's expert witness, Stephen's TS qualifies as an encephalopathy, congenital in origin, because TS is a brain abnormality acquired at birth.

Once petitioners prove that the DPT vaccine caused a significant aggravation within the statutorily-prescribed three day period following the vaccination, petitioners are entitled to compensation unless respondent meets its burden of proving, by a preponderance of the evidence, that the significant aggravation of petitioner's condition was due to "factors unrelated to the administration of the vaccine." 42 U.S.C. § 300aa-13(a)(1)(B) (1988 & Supp. II 1990).

## CONCLUSION

The court finds that the Special Master erred in her finding that tuberous sclerosis was not a pre-existing condition. Accordingly, the decision of the Special Master is vacated and remanded for proceedings not inconsistent with this order.

IT IS SO ORDERED.